IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TRACEY HAWES, #1467573, #239-770, | \* | |
| Plaintiff | \* | |
| v | \* | Civil Action No. DKC-17-3547 |
| JOHN WOLFE, Warden, | \* | |
| CO II AMEESHA HALL, Housing Unit # 4, | | |
| CO II MELVIN HARRIS, Housing Unit # 4, | \* | |
| CO II ADRION CHRISTOPHER, Housing Unit # 4, | \* | |
| CO II JERMAINE STURGIS, Housing Unit # 4, | | |
| CO II VERNON COLLINS, Housing Unit # 4, | \* | |
| CO II SKYLAR WATERS, Housing Unit # 4, | | |
| CO II CHARLES FONTAINE, Housing Unit # 4 or Other Unit, | \* | |
| SGT. JASON DERR, Housing Unit # 4, | \* | |
| LT. VANESSA JONES, | | |
| LT. JASON WALLACE, | \* | |
| SGT. JOHN BROMLEY, Housing Unit # 4, | \* | |
| Defendants | | |

\*\*\*

## MEMORANDUM OPINION

Plaintiff Tracey Hawes, a Maryland prisoner, filed a 42 U.S.C. § 1983 action against former Eastern Correctional Institution ("ECI") Warden John Wolfe[1] and eleven ECI officers alleging that he was kept under unconstitutional conditions of confinement when housed on "staff alert" status between May 4 and May 13, 2016. ECF No. 1. In his unverified complaint, Hawes seeks compensatory damages of $200,000.00 and punitive damages of $350,000.00.[2]

---

[1] Ricky Foxwell is the current Warden. *See* https://www.dpscs.state.md.us/locations/eci.shtml (last reviewed December 28, 2018).

[2] Hawes also requests a transfer to another medium security institution (ECF No. 1 at 11, ¶ 4), eradication of the "staff alert" protocol (*id.*, ¶ 3), and Defendants' suspension without pay (*id.*, ¶ 5). Hawes had been transferred from ECI to Jessup Correctional Institution ("JCI") at the time he filed this lawsuit, *see* ECF No. 1 at 5, envelope, rendering that injunctive request moot. For

Hawes does not contest the propriety of the cell search that preceded his removal from general population housing, nor does he complain about disciplinary sanctions imposed after contraband was uncovered during the search.[3] Instead, his claims focus on the restrictions and conditions imposed upon him during the ten days during which he was confined on staff alert status.

Defendants move to dismiss or alternatively for summary judgment in their favor, arguing *inter alia* that Hawes' Eighth Amendment and due process rights were not violated. ECF No. 21. To date, Hawes has not opposed Defendants' dispositive motion.[4] The motion may be decided without a hearing. *See* Local. Rule 105.6 (D. Md. 2018). For reasons set forth herein, summary judgment will be entered in favor of Defendants.

## Background

### A.     Plaintiff's Statement of Facts

Hawes contends that on May 4, 2016, he was escorted from Housing Unit #6 to Housing Unit #4, a segregation unit, for violation of an institutional rule. ECF No. 1, p. 6. Once there, he was stripped of clothing, given one sheet, and left to sleep on a floor infested with bacteria.[5] *Id.,*

---

reasons set forth herein, Hawes' lawsuit provides no basis for a court order abolishing the staff alert protocol or suspending officers without pay.

[3]     On May 4, 2016, ECI Officers Blake, Clayton, and Arndt conducted a search of Hawes' cell, which resulted in the recovery of contraband, including a cell phone, watch, and charging cable. *See Hawes v. Foxwell, et al.,* Civil Action No. DKC-17-2598 (D. Md.), ECF No. 11-2, p. 4. This previous lawsuit alleged that Foxwell, Blake, Clayton, Arndt and another officer failed to secure Hawes' personal property after searching his cell, resulting in the loss of legal and personal documents. *Id.*, ECF No. 1. Hawes' property claim was dismissed by Memorandum Opinion and Order dated May 24, 2018. ECF Nos. 15, 16.

[4]     Consonant with the dictates of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Hawes was notified on July 2, 2018, that Defendants' motion could be treated as a motion for summary judgment and that he was entitled to file an opposition with materials in support. ECF No. 22.

[5]     In ARP ECI-1252-16, Hawes stated that the floor was covered in the residue of feces, urine, vomit, roaches, ants and ticks. ECF No. 1-4 at 3.

2

pp. 6-7. Hawes also states that he was not provided a mattress, toiletries, soap, clothing, mail, stationary, legal documents,[6] mail,[7] or stationery in violation of ECI Institutional Directive ("ID") 110.0006.1. *Id*. When he inquired why he was in a cell in such condition, he was informed that when on staff alert status, a prisoner's clothing was removed for five days. *Id.* at 8.

Hawes protested the conditions to which he was subjected by holding open his feed slot. *Id.* at 8. He complains that food was occasionally withheld between May 4 and May 9, 2016, by Defendants Hall, Harris, Christopher, Collins, Waters and Fontaine because he kept the feed slot open and refused to walk to the back of the cell. *Id.* Hawes states that he never refused his meals, and that in addition to an Eighth Amendment violation, the withholding of food violated ID 110.0006.1, which states, "food shall never be used as a form of punishment." *Id*.

Hawes also claims that from May 4, 2016, through May 13, 2016, he was not permitted to take a shower or have a daily hour of recreation in violation of state law, federal law, and institutional rules. *Id*.

Hawes alleges that he was denied proper medical care and access to sick call slips and did not receive his .81 mg of daily aspirin taken for a heart condition and treatment for chest pain. *Id*. at 8-9. As a result, he claims to suffer now from depression, anxiety, and insomnia for which he now takes Doxepin. *Id*. at p. 9.[8]

---

[6] Hawes' allegations concerning the loss of transcripts and legal materials, including his criminal file, were fully litigated in *Hawes v. Foxwell, et al.,* Civil Action No. DKC-17-2598 (D. Md.), and will not be reexamined here.

[7] Hawes stated that both incoming and outgoing mail was impeded for ten days. ARP ECI-1252-16, ECF No. 1-4 at 4.

[8] Doxapin is used to treat mental or mood problems such as depression and anxiety. *See* https://www.webmd.com/drugs/2/drug-8647-610/doxepin-oral/doxepin-capsule-oral/details (last reviewed December 2, 2018).

**B. Defendants' Statement of Facts**

This action represents Hawes' second lawsuit concerning events arising out of the May 4, 2016, search of his cell, located on Housing Unit #6. On that date, three ECI officers[9] conducted a search of Hawes' cell, and found Hawes wearing a prohibited cell phone watch. A charging cable also was discovered. ECF No. 21-3, Notice of Inmate Rule Violation #2016-015; *see also Hawes v. Foxwell, et al.,* Civil Action No. DKC-17-2598 (D. Md.) ("*Hawes I*"),[10] ECF No. 11-2 at 4-5 (Notice of Inmate Rule Violation); ECF No. 11-3, ¶ 4 (Blake Decl.); ECF No. 11-4, ¶ 4 (Clayton Decl.); ECF No. 11-5, ¶ 4 (Arndt Decl.). The three officers escorted Hawes to the dayroom to be strip-searched. *Hawes I,* ECF No. 11-2 at 4. While in the dayroom, Hawes threatened staff and the prisoner who had informed staff about the cell phone watch. ECF No. 21-3; *see also Hawes I, id.* He received a notice of inmate rule violation for possessing the contraband and for threatening staff and other inmates, and was taken to Housing Unit #4, where he was placed on administrative segregation pending adjustment on a level one staff alert due to his behavior, threats, and violation of inmate rules. ECF No. 21-3; *see also Hawes I,* ECF No. 11-2 at 5-6, 11. Hawes later pleaded guilty to three rule violations and received ninety days in disciplinary segregation. *Hawes I, id.,* ECF No. 11-2 at 9-11.

Hawes was taken to Cell B1 in Housing Unit 4 on May 4, 2016, and placed on "Staff Alert Level I" status. ECF No. 21-4, Record of Segregation Confinement at 1; ECF No. 21-5, Traffic

---

[9] Lieutenants Blake and Clayton and Correctional Officer II Arndt, who conducted the search, were assigned to the Investigative and Intelligence Division within the Department of Public Safety and Correctional Services ("DPSCS"). *Hawes I,* ECF Nos. 13-3, 11-4, and 11-5, Blake, Clayton and Arndt Declarations.

[10] In this first action, Hawes sought compensatory and punitive damages against Warden Foxwell and Officers Blake, Clayton, Arndt, and Murphy, for failing to secure his personal property after searching his cell. On May 24, 2018, this court granted Defendants' motion to dismiss. *See Hawes I,* ECF Nos. 15 and 16.

History; ECF No. 21-6, Staff Alert Memorandums at 5. As defined in ECI Directive ECI.110.0006, staff alert status is "[a] temporary custody status for the retention of assaultive or aggressive inmates on disciplinary or administrative segregation, who have exhibited behavior that is a threat to the security and order of the institution or who threaten harm to themselves, others or property." ECF No. 21-7, Facility Directive Number ECI.110.0006 at 3. Under the Directive, Staff Alert Restriction Levels I, II, and III are used for progressive control of aggressive or assaultive prisoners and a worksheet (*id.*, Attachment B) is provided as a guideline that does not restrict the sanctions that may be imposed. *Id.* at 12, 16. A prisoner's behavior is evaluated every day and, if he is compliant, he goes to the next level of staff alert (from Staff Alert Level I to Staff Alert Level II to Staff Alert Level III) and will be removed from Staff Alert Status completely in five days. ECF No. 21-8, Declaration of Michael Daugherty, ¶ 7. If non-compliant (e.g., by refusing to move to the back of the cell or holding open the feed-up slot), he will remain on Staff Alert Status for a longer period. *Id.*

All prisoners are strip-searched after being transferred to a Staff Alert cell, then receive a cool down period of roughly half an hour before staff attempt to interact to provide the paper gown and booties provided to those on Staff Alert Level I. *Id.* at ¶6. If a prisoner does not comply with officers' orders to move to the back of the cell, the officers will not open the slot to give him the paper gown and booties, thus avoiding a situation where the prisoner could assault them. *Id.*

There is no bunk or mattress inside the Staff Alert cell, although Staff Alert Level II prisoners may receive a mattress at the discretion of the officer in charge. *Id.*, ¶ 8. Medical personnel walk by the Staff Alert cells daily to provide necessary medical attention. *Id.*, ¶ 9. Prescription medications are handed out if prisoners comply with officers' orders. *Id.* If a prisoner does not comply with officers' orders (e.g., to move to the back of the cell and close the feed-up slot), the officers will not open the slot and put themselves in a situation where they are subject to

5

assault. *Id*., ¶ 12. Prisoners are ordered to the rear of their cell before the slot is opened for meal service. Exhibit 21-5 at 12. If a prisoner refuses to comply with orders to move to the rear of the cell, his meals are delayed. *Id*.

Staff Alert cells each have a working toilet and sink. *Id*., ¶ 12. Because prisoners on staff alert often use toilet paper and hygiene items to block windows or flood the tier, they are provided those items on an as-needed basis. *Id*. These items, as well as showers, are provided only if Staff Alert prisoners comply with officers' orders to move to the back of the cell and close the feed-up slot. *Id*.

Once a Staff Alert prisoner progresses through the Staff Alert protocol and is moved to a regular segregation cell, the Staff Alert cell is cleaned thoroughly before another prisoner is placed in the cell. *Id*. at ¶13. The only way feces or vomit would be in a Staff Alert cell is if the current occupant created the feces or vomit. *Id*. If this occurs, the cell is cleaned only if the occupant complies with orders, to protect officers and prisoners on the sanitation crew. *Id*. Housing Unit 4, where the Staff Alert cells are located, is sprayed quarterly to eradicate infestation of insects, or more frequently if an outbreak occurs. *Id*., ¶ 15.

Hawes was verbally disrespectful to staff after his placement in the Staff Alert cell. ECF No. 21-4 at 2. He stuck his arm out of the feed slot for his dinner bag and did not remove his arm despite several direct orders to do so. *Id*. He was seen by medical personnel on May 4, 2016, after he was placed on Staff Alert status, and voiced no physical or mental concerns. ECF No. 21-9, Medical Records at 3.

On May 5, 2016, Hawes was denied a shower because he was kicking and banging on the cell door. ECF No. 21-4 at 2. He did not receive his dinner food bag because he rushed to the door, put his hand out of the slot, and refused direct orders to remove his hand. *Id*. Lieutenants Jones and Wallace spoke to him without success, and orders were given restricting Hawes to meals

consisting of segregation loaf. *Id*. Exhibit 4 at 2, 4. He was not given segregation loaf on May 5, 2016, because he refused to close his slot, step to the back of his cell, and remove his smock out of the feed slot. ECF No. 21-4 at 2. Hawes became irate, yelled profanities, and kicked the door. *Id*. He was charged with rule violations as a result of this behavior. ECF No. 21-10, Notice of Inmate Rule Violation #2016- 016 at 2.

On May 6, 2016, Hawes refused his segregation loaf and later failed to follow the feed-up procedure. ECF No. 21-4 at 2. On May 7, 2016, Hawes refused to comply with the feed-up procedure during the 12-8 and 4-12 shifts. *Id*.

On May 8, 2016, Hawes was afforded the opportunity to receive his segregation loaf and given orders to close his slot, which he refused to do, stating, "Fuck you bitches. Ya'll are torturing me. Just give me the fucking bag you fat ass pig." *Id*. This was considered a refusal of his meal. *Id*.

On May 9, 2016, Hawes verbally refused the feed-up procedure during the 12-8 and 8-4 shifts and was observed sticking his arm out the slot with his blanket tied around the slot to prevent it from being closed. ECF No. 21-11, Notice of Inmate Rule Violation #2016-17 at 2. Hawes was seen by medical personnel and stated that he was on an involuntary hunger strike. ECF No. 21-9 at 2. Cheryl V. Tyler, RN noted that the sign above the door stated that inmate was on segregation loaf. *Id*.

By May 12, 2016, Hawes' behavior had improved and he was moved to Staff Alert Level II. ECF No. 21-6 at 2. On May 13, 2016, he was moved to Staff Alert Level III. *Id*. at 1. On May 16, 2016, Hawes' behavior was deemed satisfactory and he was removed from Staff Alert Status. *Id*. at 3.

On May 17, 2016, Hawes complained to medical personnel that "I have a heart condition and should be followed by chronic care but I have not been seen since I have been here." ECF

7

No. 21-9 at 4. Nicole Frey, RN, noted that, "[Electronic Personal Health Record] does not indicate chronic care/cardiology issue/dx." *Id*. On May 21, 2016, Hawes was again seen by medical personnel and complained, "I have a rash under my arm and on my neck, but I hadn't showered for like 12 days when I got down here, but when I finally did it went away." *Id*. at 7. Nichole Frey, RN, noted her findings, "NO rash noted on areas of complaint. Skin warm/dry/intact." *Id*.

Lieutenant Michael Daugherty, to the best of his recollection, does not recall Hawes or other prisoners on the segregation unit complaining of insect infestation between May 4, 2016, and May 16, 2016. *Id.*

## Standard of Review

This court considers documents beyond those intrinsic to Hawes' complaint. Consequently, the court treats Defendants' motion as one for summary judgment. Where "the movant shows that there is no genuine dispute as to any material fact," the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Importantly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court views the evidence in the light most favorable to the nonmoving party and draw all inferences in his favor. *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). That said, the court must nonetheless fulfill its "affirmative obligation" to "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted),

quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002), quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 199)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery

9

was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary and the "nonmoving party's objections before the district court "served as the functional equivalent of an affidavit." *Id.* at 244-45 (internal citations omitted).

Hawes has filed a Maryland Public Information Act ("MPIA") request to obtain logbook entries showing that he did not receive showers and a copy of video footage that might prove that he never left the cell between May 4 and May 13, 2016. ECF No. 1 at 9; ECF 1-3 at 2. He has not filed an affidavit under Rule 56(d), nor has he objected to Defendants' dispositive motion. Given this failure, the court will accept Hawes' statements concerning a lack of showers and his continued detention in his cell and is satisfied that it is appropriate to address the motion submitted by the individual Defendants as one for summary judgment.

**Discussion**

Defendants move for summary judgment as to Hawes' claims that the conditions of his confinement while on staff alert status violated the Eighth Amendment prohibition against cruel and unusual punishment and violated due process. Hawes does not dispute that his threatening behavior merited his placement on staff alert status, and Defendants do not dispute that while on the highest level of staff alert status, Hawes was without a bed and mattress.

10

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to prisoner health or safety was disregarded. *Wilson*, 501 U.S. at 298-99. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Deprivation of a bed in a correctional facility does not necessarily transgress such a line. *See Lowery v. Bennett*, 492 F. App'x 405, 407, 410 (4th Cir. Aug. 9, 2012) (unpublished) (10-day placement on strip-cell confinement, which included removal of prisoner's personal hygiene items, religious books, mattress, bedding, towels, and clothing, did not violate Eighth Amendment); *Williams v. Delo*, 49 F.3d 442, 444 (8th Cir.1995) (four days without clothes, mattress, water,

11

bedding, legal mail or hygienic supplies not a violation of Eighth Amendment); *Crowe v. Leeke*, 540 F.2d 740,741-42 (4th Cir. 1976) (newly arrived prisoners sleeping on floor while facility under construction does not state claim).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler,* 989 F.2d at 1381. Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of "a serious or significant physical or emotional injury resulting from the challenged conditions." *See De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003), quoting *De'Lonta*, 330 F.3d at 770.

Defendants' conduct is not actionable unless, "in light of preexisting law the unlawfulness of those actions is apparent." *Iko v. Shreve*, 535 F.3d 225, 237-38 (4th Cir. 2008), citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct." *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007), quoting *Jackson v. Long*, 102 F.3d 722, 731 (4th Cir. 1996).

No bright line was crossed when Hawes was housed on staff alert status. The conditions described by Hawes were not so severe that Defendants could be charged with "fair warning that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006), citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The discomforts experienced by Hawes were restrictive and harsh but were of limited duration. Hawes received more amenities each day after his conduct improved, and soon returned to a "regular" cell on the disciplinary

segregation unit. His medical complaints concerning physical ailments were promptly addressed, and he voiced no mental health concerns concurrent to his Staff Alert status confinement. The temporary restrictions did not impose cruel and unusual punishment on Hawes, a conclusion supported by the absence of proof of significant, serious physical or psychological injury[11] resulting from Hawes' brief stay on level one staff alert status.

For these reasons, Defendants' motion for summary judgment is granted. A separate Order will be entered in accordance with this Memorandum Opinion.

Date: January 7, 2019

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[11] Hawes provides no indication that the brief period during which he did not receive daily aspirin exacerbated any diagnosed heart conditions, nor does he demonstrate that his current use of an antidepressant medication is attributable to the ten days he spent in a Staff Alert status cell.